**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**6:14-cv-01342-PGB-KRS**

**UNITED STATES OF AMERICA, ex rel.**
**GEORGEANN GOHEEN,**

      **Plaintiff/Relator,**

**v.**

**MEDICAL SERVICES OF AMERICA, INC.,**
      **a South Carolina corporation, and**
      **Florida foreign corporation,**

      **Defendant.**

_____/

**FIRST AMENDED QUI TAM COMPLAINT**
**PURSUANT TO 31 U.S.C. §§ 3729-3733**
**THE FEDERAL FALSE CLAIMS ACT**
**FOR TREBLE DAMAGES, CIVIL PENALTIES,  AND EQUITABLE RELIEF**

Plaintiff, United States of America ex rel. Georgeann Goheen, by and through the undersigned attorney sues Defendant, Medical Services of America, Inc., a South Carolina corporation, and Florida  foreign corporation, d/b/a MSA Home Health, Community Home Health, Medi Home Health Agency, and Medi Home Care (hereinafter "MSA"), and states:

**I.**    **INTRODUCTION**

1.    Plaintiff/Relator brings  this action on behalf of the United States to recover treble damages of $1,097,784.96,  civil penalties of  not less than $10,781.00 per false claim violation alleged, totaling $3,557,730.00, and for other monetary and equitable relief available, pursuant to the False Claims  Act  31 U.S.C. §§ 3729-3733 (hereinafter "FCA").

2.    First Amended Qui Tam Complaint  relates to Defendant, MSA's violations of 31 U.S.C. § 3729, and 31 U.S.C. § 3730 (h)  excerpted in pertinent part,  to wit:

§ 3729 (a)(1) (A)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval (Count 1-Count 110, inclusive);

§ 3729 (a)(1) (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (Count 111-Count 220, inclusive);

§ 3729 (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decrease an obligation to pay or transmit money or property to the Government (Count 221-Count 330, inclusive); and

§ 3730 (h) employee discharged, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee to stop 1 or more violations of the FCA (Count 331).

## II.    JURISDICTION AND VENUE

3.     This action arises under 31 U.S.C. § 3729, et seq.  Pursuant to 31 USC § 3730, a private person may bring a civil action for a violation of § 3729 for the person and for the United States. This Court possesses subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732 (a) because the defendant resides or transacts business in this district. All procedural pre-requisites required before the initial filing of this action have been met by Relator. Further this Court has jurisdiction pursuant to 31 U.S.C. § 3730 (h) related to retaliatory discharge as a result of furtherance of this action, or to stop 1 or more violations of the FCA by Defendant.

4.     Venue is proper in this district under 31 U.S.C. § 3732 and 28 U.S.C. § 1391 (b) and (c)  because at least one of the defendants resides or transacts business in this district, and because the claims arose in this district. Further, venue is also proper in this district under 31 U.S.C. § 3730 (h)(2) for Relator's retaliatory discharge on April 21, 2016.

**Page 2 of  34**

### III.    THE PARTIES

5.      Georgeann Goheen is a resident of Orlando, Florida, and was employed as the Administrator  of  MSA's Winter Park Office from on or about August 29, 2012,  through and including discharge by MSA on April 21, 2016.

6.      Medical Services of America, Inc. is a Florida foreign corporation with  corporate headquarters located in Lexington, South Carolina.  MSA is a comprehensive home  healthcare provider that offers home healthcare, hospice service, durable  medical equipment, and  other services.   At all times material hereto MSA maintained and owned locations across the country in Florida, Georgia, Indiana, Kentucky, Maryland, Nevada, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia. At all material times, MSA conducted  business in the Southern, Middle and Northern Districts of Florida. All MSA  employees and officers named in this Second Amended Complaint acted within the manner and scope of their respective employments with MSA, and  had  actual or apparent authority from MSA to do the acts complained of herein.

### ALLEGATIONS COMMON TO ALL COUNTS

7.      Specifically, Defendant, MSA engaged  in the following unlawful Medicare billing practices, all related to false or fraudulent claims for payment or approval made to the United States: a.)  billing for services not medically necessary and/or not ordered  by a treating physicians to increase Medicare billing; b.) billing for HHC services for patients that did not qualify for HHC services under Medicare guidelines; c.) patient file documentation certifications or re-certifications falsified for Medicare billing purposes; d.)  excessive certifications or re-certifications for patients

that were neither not homebound, or did not qualify for continued HHC services for a variety of reasons; e.) cookie cutter therapy visits ordered regardless of patient Acuity to increase billings to Medicare, regardless of medical necessity; f.) up-coding patient diagnosis codes for Medicare billing purposes; and g.) falsely reporting certain patients as "homebound" when in fact they were not homebound.

8.     Upon Relator's arrival at MSA Winter Park to run that office as Administrator, Janet Persaud, MSA Biller Coder was up-coding patient's plans of care for Medicare billing purposes using a computer program designed for that purpose. Ms. Persuad was using a PPS program to scrub patient data to arbitrarily increase Medicare billing by changing severity of medical conditions, by creating higher functionality limitations, manipulating the designated order of diagnosis codes and by re-arranging, changing, and increasing required skilled visits. These things were done in the MSA billing office with no treating physician or MSA clinician input, authorization, or acquiescence after the fact, contrary to federal law and Medicare regulations.

9.     After Relators arrival at MSA Winter Park, Relator soon learned via examination of patient files and office records that prior MSA Winter Park Administrator, Donna Smargon, hired a local physician, Kristy MaGee, MD as Medical Director of MSA Winter Park, during the period May, 2010-the spring of 2012, that included services performed by Kristy MaGee, MD for MSA that were contrary to federal law and Medicare regulations. During her tenure with MSA Winter Park, Ms. MaGee certified and re-certified hundreds of MSA patients' plans of care for Medicare billing purposes, notwithstanding that Ms. MaGee was not the treating physician of those MSA patients for which Ms. MaGee certified plans of care, and notwithstanding that federal law specifically prohibited Kristy MaGee from doing so, because MSA was paying Kristy MaGee based upon a

financial compensation agreement that Kristy MaGee had with MSA at that same time.

10.    The certification or re-certification of HHC patient' plans of care by any doctor that is not that patient's treating physician is unlawful under federal law and Medicare regulations, and is the basis for later false or fraudulent claims for payment or approval made by that HHC to Medicare in reliance thereon.

11.    The combination  of  Janet Persuad in the billing office, and Kristy MaGee, MD signing  MSA  patient's plans of care as requested by MSA Administration, Donna Smargon, resulted  in approximately 400-500 MSA patient 60 day episodes being billed to Medicare unlawfully during the time period  May, 2010 through and including the spring of 2012.

12.    During Relator's Administrator orientation for MSA Winter Park Office, Relator was constantly  told  "the train is on the tracks" and Relator's job "is to keep it there." Relator was advised that her predecessor Donna Smargon had one of the best profit margins in MSA and was recognized by MSA as Administrator Of The Year at an MSA annual summit in 2011.

13.    Prior to on or about August 21, 2012, all MSA Winter Park clinical staff patient documentation was in paper format and maintained in patient files. After August 27, 2012  Relator reviewed  patient  files for all current MSA patients on the rolls at Winter Park,  and  compared hard copy clinical documentation for MSA patients, to plans of care instituted for those MSA patients. Relator  discovered that hundreds of MSA patient 60 day episodes were previously billed to Medicare by MSA Winter Park unlawfully.

14.    As Relator delved deeper into MSA Winter Park patient files, and  physically reviewed older patient charts  related  to  patients  still on MSA Winter Park's patient census reports as of August 27, 2012, Relator discovered a multitude of unlawful billings practices going back to 2010

regarding Medicare billings made for patients: a.) not homebound; b.)  receiving un-skilled services being billed as skilled services; c.) diagnosis up-codes by billing department; d.) skilled service visits added by billing department; e.)  therapy service visits added by billing department;   f.) Medical Director Kristy MaGee certifications, or re-certifications of up-coded patient diagnosis and billing department modified plans of care; and g.) patients discharged by MSA Winter Part only to be certified  with  new plans of care within a week or two thereafter, in order to create new 'start of care' dates on paper to make that patient look like a new patient as opposed to an excessively re-certified patient that could otherwise be a red flag to Medicare.

15.    Relator notified the MSA Board Of Directors of Relator's findings and advised the Board that Relator would be immediately discharging a large number of MSA Winter Park patients who did not qualify for HHC, and that  Relator would be seeking the resignation or termination of multiple MSA Winter Park employees related thereto.

16.    Beginning in January, 2013, Relator  began giving the entire MSA Board Of Directors quarterly verbal reports relative to the discharging of MSA patients not qualified to receive HHC paid by Medicare, that were previously billed to Medicare. Over one hundred (100) patients discharged  by Relator were  previously certified  or  re-certified  to receive home health care by MSA Winter Park that were on MSAs patient census for many years.

17.     The MSA Board Of  Directors would  not  consider  returning  prior  payments received  from Medicare regarding  Relator's  discharged  patients  that were not entitled to receive home health care services  previously  billed to Medicare.  Instead, the Board made  jokes  related to Relator's discharging of MSA Winter Park patients that did not qualify for HHC.

18.    Request For Anticipated Payment (hereinafter "RAP") summaries for the period

1/1/2008-1/31/2012 titled "Billed RAP Report" comprising 996 pages has been previously provided in full to Defendant, MSA in Rule 26 Disclosures made. Appendix 1-Matrix contains excerpted line item RAP information for patient episodes referenced in Appendix 1, excerpted from this Billed Rap Report summary, identified here by specific reference. Appendix 2- Matrix contains a breakdown of dates and amounts billed to Medicare, related to patient episodes 1-110 referenced on Appendix 1. Relator hereby incorporates by specific reference MSAs "Billed RAP Report", as excerpted in Appendix 1 for specific patient episodes, as though that original 996 page original source document titled "Billed Rap Report 1/1/2008-1/31/2012" were fully set forth herein, or appended hereto.

19.   "Report: Discharge Reason With Patient Addresses" (hereinafter "Goheen Discharge Summary"), Relator's discharge summary for the period 9/1/12-12/31/13 and comprising 39 pages, has been previously provided in full to Defendant, MSA in Rule 26 Disclosures made. Appendix 1 references to 65 MSA HHC patients discharge by Relator after Relator commenced employment for MSA on or after August 27, 2012. Appendix 1 RAP Report Matrix references the page number referencing discharge of that same patient in the Goheen Discharge Summary in the column headed "GGD". Relator hereby incorporates by specific reference the Goheen Discharge Summary, as excerpted in Appendix 1 for specific patient episodes, as though that original 39 page original source document titled "Report: Discharge Reason With Patient Addresses- 9/1/12-12/31/13" were fully set forth herein, or appended hereto.

20.   All Appendices attached to Relator's Amended Complaint are incorporated herein by specific reference as though the information contained within those Appendices were fully set forth herein.

21.    Relator identified approximately sixty-five (65) MSA Winter Park HHC patients that Relator discharged because those patients were not entitled to receive home health care benefits, that were previously certified or re-certified by Kristy MaGee, MD for those specific patients' plans of care episodes referenced. (Appendices 1-2 Matrices). The certifications or re-certifications for these specific plans of care episodes referenced in Appendices 1-2 Matrices, represented mandatory 'on file' supporting documentation for claims made for payment or approval by MSA to Medicare regarding these same patient episodes.

22.    To the extent that MSA used falsely certified or re-certified 'on file' documentation to support Medicare billing for these patient episodes referenced (Appendices 1-2 Matrices), all final claims made by MSA for payment or approval based upon that false supporting documentation represent false or fraudulent final claims made to Medicare for those patient episodes referenced.

23.    Kristy MaGee, MD signed plans of care for all the 65 patients identified in Appendices 1-2 Matrices that Ms. MaGee was not legally authorized to sign under federal law or Medicare regulations.

24.    Related to these specific 65 MSA patients discharged by Relator, Relator avers that MSA committed 330 separate false claims act violations for patient 60 day episodes identified in Appendices 1-2 Matrices.

25.    Based upon these 110 separately referenced patient episodes (Appendix 1-2 Matrices) in which false or fraudulent plan of care certifications and re-certifications (CMS Form 485s) signed by Kristy MaGee, MD were used by MSA as supporting documentation for final Medicare billing, 110 separate false or fraudulent claims for payment or approval resulted.

26.    Moreover, the final Medicare billings made for these 110 patient episodes,

**Page 8 of  34**

dependent upon false certifications within CMS Form 485s signed by Kristy MaGee, MD, created 110 separate obligations to repay Medicare for provisional advanced payments received by MSA from Medicare for these patient episodes for which MSA was not entitled, as well an 110 additional obligations to repay Medicare for final payments received.

27.     Lastly, these same false and fraudulent plan of care certifications CMS Form 485s signed by Kristy MaGee, MD represent 110 false records or statements material to false or fraudulent claims, within the meaning of § 3729 (B), supra.

28.     Relator avers that Relator was discharged from her Administrator position at MSA's Winter Park Office, as direct retaliation for filing the instant case, that was Ordered unsealed by this Court, on or about February 2, 2016 [DE 25]. Shortly thereafter, MSA became aware of this Quitam action filed by Relator. Relator was thereafter placed on a 90 action plan for by MSA, as a prelude to termination.

29.     On April 4, 2016 Defendant MSA was sent a demand letter prior to Relator's termination warning MSA that any intended demotion or termination or Relator would be considered a direct violation of 31 U.S.C. § 3730 (h) under the circumstances. (Appendix 5)

30.     Relator's employment as Administrator of MSA Winter Park Office was terminated by MSA, contrary to 31 U.S.C. § 3130 (h) on April 21, 2016, simply because MSA learned of this un-sealed Quitam action filed by Relator against MSA and for no other legitimate reason.

## IV.     THE MEDICARE PROGRAM

31.     In 1965, Congress enacted Title XVIII of the Social Security Act [hereinafter "Medicare" or the "Medicare program"] to pay for the costs of certain health services and health care. Entitlement to Medicare is based on age, disability or affliction with end-stage renal

disease. <u>See</u> 42 U.S.C. §§ 426, 426A-1. Medicare consists of two separate programs, Parts A and B. Part A provides insurance for certain elderly or disabled persons to cover the costs of inpatient hospital care, nursing facility care, home health services, and hospice care. See generally 42 U.S.C. §§ 1395c to 1395i-5. Home health care services are reimbursed to providers under Medicare Part A.

32.     Since Medicare is a cost reimbursement system, a Medicare Provider cannot lawfully bill Medicare for services that were not performed, were not medically necessary (See 42 U.S.C. § 1395y(a) (1) (A); See 42 U.S.C. § 1320c-5(a) (1)), See also 42 CFR 411.15(k) (1)), or were billed in violation of federal law, or Medicare guidelines.

33.     Effective March 23, 2010, knowingly failing to return an overpayment to Medicare specifically became an 'obligation' to pay money to the government for purposes of 31 U.S.C. § 3729 (a)(1)(G), and upon which a false claims act violation would lie. See 42 U.S.C. § 1320a-7k(d) (March 23, 2010)

## V.     PALMETTO GBA:

34.     For all times material to this Amended Complaint, Palmetto GBA, headquartered in Columbia, South Carolina, was awarded the contract from the Centers For Medicare & Medicaid Services ("CMS") and administered, inter alia, Part A Medicare fee-for-service home health care claims in Florida on behalf of Medicare. As such, Palmetto GBA, Columbia, South Carolina, as a contractually appointed Agent of CMS, received and processed electronic claims for payment and approval from MSA, and approved and paid MSA for claims made, via electronic funds transfer or ACH funds transfer to MSA, Lexington, South Carolina.

## VI.    HOME HEALTH CARE REGULATIONS, CLAIMS, AND CERTIFICATIONS:

35.     Effective on or after May 23, 2007, and at all times material hereto, all home health

care providers in Florida, including Defendant, MSA, were required to use  CMS Forms titled "UB 04 CMS 1450", or an electronic equivalent,  related to fee for service home health care (hereinafter "HHC") claims made to Medicare's fiscal Agent, Palmetto GBA.

36.     CMS Form 1450 [Appendix 3] contains a Certification, excerpted in pertinent part as follows:

> "UB 04-NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETAR[]Y PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).
>
> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:
> ...
>
> **3.     Physician's certifications and re-certifications [CMS Form 485s], if required by contract or Federal regulations, are on file.**
> ..."

UB 04 CMS 1450 [Appendix 3, p. 2][Emphasis added]

37.     True, accurate and complete physician's certifications and re-certifications of patient's plans of care (hereinafter  "CMS Form 485" or "POC") are required to be "on  file" in a HHC  patient  file, in order to evidence medical necessity, compliance with Medicare regulations, and compliance with federal laws related to home health services rendered; and as mandatory  pre-requisites for lawful final billing and reimbursement under the Medicare Program Part A for home health care services.

38.     Truthful certifications and  re-certifications must be 'on file' in  a  HHC  patient's

medical file, a pre-requisite to billing Medicare, for every single 60 day episode billed. To the extent the certifications and re-certifications do not exist, or are false, the HHC cannot lawfully finally bill Medicare under federal law, and any provisional advance payment received from Medicare related thereto becomes an 'obligation' to repay the United States money that was received without entitlement.

39.     42 C.F.R. § 424.22 (2010) (Appendix 4) mandates that treating physician certifications (for initial plans of care) and re-certifications (for subsequent plans of care) exist in a patient's file for that particular 60 day episode; sets forth the text of the certifications and re-certifications to be made by the treating physician on the face of the POC; and states in the introductory paragraph that Medicare *only* pays for Medicare Part A or Part B if a physician certifies and re-certifies the content specified therein. 42 C.F.R. § 424.22 (2010) (Appendix 4), See also 42 U.S.C. § 1395f(a)(2)(C), See also Title 18 § 1814 Social Security Act, subsections (2)(C).

40.     Without these mandatory certifications and re-certifications Medicare cannot determine medical necessity, without which payments can never be authorized or paid under the Medicare Program by federal law.

41.     Medicare requires that a treating physician of a HHC patient personally sign these certifications and re-certifications, because as a treating physician that person is the only person that could truthfully attest to the information required therein.

42.     To the extent *a physician* signed a certification or re-certification, notwithstanding that the physician had no doctor-patient relationship with that particular patient, that certification or re-certification would be false on it's face, because it would be impossible for just any physician to attest to the plan of care for a patient that the physician never met, treated, or diagnosed.

43.     Additional Medicare requirements for certification or re-certification by treating physicians of their patients being vetted for home health care were added effective January 1, 2011. On or after January 1, 2011, the same treating physician responsible for performing the certification or re-certification of a HHC patient must also document that a face-to-face patient encounter [hereinafter "face to face" or "F2F"], which is related to the primary reason the patient requires home health services, has occurred no more than 90 days prior to the home health start of care date or within 30 days of the home health care start of care date, determined by the date of the encounter listed. See 42 C.F.R. 424.22 (a)(v) (effective January 1, 2011).

44.     As such, the existence of a valid F2F form signed by the treating physician of a HHC patient must also be "on file" as a material pre-requisite to a latter truthful certification or re-certification by a treating physician of that same patient's plan of care for each 60 day certification period. The truthful certification or re-certification by a treating physician of a patients plan of care, CMS Form 485, then becomes a pre-requisite to lawfully finally billing Medicare for that patient episode, via a subsequent billing Certification made on UBO4 CMS Form 1450 (Appendix 3); 42 C.F.R. 424.22 (a)(v); Medicare Benefit Policy Manual, Chapter 7 HHC, § 30.5.1.

45.     Federal law prohibits a physician who has a compensation arrangement, or direct or indirect employment relationship with a HHC from ever signing a certification or re-certification to be relied upon used as "on file" supporting documentation, or justification, for finally billing Medicare at the conclusion of a patient's 60 day episode for any reason. Moreover, on or after January 1, 2011 a physician who has a compensation arrangement with the HHC is specifically prohibited from signing the same HHC's patient's F2F. 42 C.F.R. § 424.22 (d)(1) (2010)(Appendix 4)(physician that has a financial relationship with the HHA prohibited from certifying or re-

certifying need for home health services to be provided by that same HHC), See also 42 U.S.C.

§1395f (a)(2)(a physician "who does not have a direct or indirect employment relationship with the

facility" must certify and re-certify), See also Title 18 § 1814 (2) (a physician "who does not have

a direct or indirect employment relationship with the facility" must certify and re-certify).

46.    A Medical Director of a HHC that is financially compensated by the HHC for services

rendered cannot lawfully sign certifications, re-certifications, or F2F forms for that same HHC's

patients, to be  used by the HHC  as "on file" documentation supporting medical necessity,  for

certification of compliance to Medicare, or for Medicare billing, related to that falsely certified or

re-certified  HHC  patient's 60 day plan of care. 42 C.F.R. § 424.22 (d)(1)   (Appendix 4)

47.    Notwithstanding, a   Medical Director of a HHC could never  truthfully sign a

certification, re-certification or   F2F  document  related  to  a HHC's patient, regardless of the

monetary prohibition, because that Medical Director is not the treating physician of the HHC's

patient, has never treated or diagnosed that patient, and has absolutely no personal relationship with

that patient.

48.    Medical Directors of HHCs that sign these mandatory forms are doing so simply

because the HHCs cannot bill Medicare without this source documentation "on file", and chances

are since these forms are merely maintained in the HHC's patient file, they will not be caught.

49.     A Medical Director of a  HHC  is  not legally authorized to institute plan of care,

changes it, modify it, insert addendums to it, order medications, etc...for the same reason that the

Medical Director cannot institute an original plan of care–they are not the treating physician of the

patient and are being financially compensated  by  the HHC  merely  for signing documents

necessary for Medicare billing purposes. This scenario leads to Medicare fraud, up-coding, services

provided that are not medically necessary, and services provided to patients that do not initially qualify, or re-qualify for home health care. That is the harm feared by Medicare and the reason these mandatory pre-requisites and billing requirements for home health care are required by federal law.

50.   To the extent a HHC Medical Director signs certifications and re-certifications so that a HHC can finally bill Medicare, and keep advance provisional payments received from Medicare for that patient's 60 day episode, those documents are false and/or fraudulent on the face of those documents for these reasons: a.) financial compensation to the Medical Director prohibits the Medical Director from signing these documents for the HHC for Medicare billing purposes; b.) the Medical Director is not a treating physician of the HHC patient and therefore falsely certifies or re-certifies the medical necessity for services and treatments listed in the HHC plan of care being signed; and c.) the manner in which the certifications or re-certifications are signed implies that the Medical Director of the HHC may in fact work in the treating physician's office, due to the fact that the Medical Director is signing these forms underneath the treating physician's signature block.

51.   A "Home Health Care Certification And Plan Of Care" certification or re-certification CMS Form 485 contains the following oath:

> "26.   I certify/re-certify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. **The patient is under my care**, and I have authorized the services on this plan of care and will periodically review the plan." CMS Form 485, ¶ 26. [Emphasis added]

> "28.      Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws."  CMS Form 485, ¶ 28

52.      The truthful certifications and re-certifications mandated by 42 C.F.R. § 424.22, 42 U.S.C. § 1395f, and Title 18 § 1814 of the Social Security Act, are the same truthful certifications

and re-certifications required by UB 04 CMS Form 1450, and CMS Form 485 as pre-requisites for finally billing Medicare for a HHC's patient's 60 day episode plan of care treatments, and for keeping provisional advance payments made by Medicare to the HHC for that plan of care episode; e.g provisional payments made prior to the final billing based upon RAPs dropped.

53.   Medicare guidelines permit a HHC to bill Medicare provisionally prior to the final billing to Medicare for a home health care patient's 60 day episode by billing Medicare with a Request For Anticipated Payment (hereinafter "RAP" or "provisional payment" or "advance payment"). Once that RAP is dropped electronically it is paid within a few days.

54.   When Medicare receives a RAP from a HHC (for Florida that is Medicare's Agent, Palmetto GBA) it automatically pays up front, 60% of the anticipated final billing to the HHC, based upon diagnoses and treatments cited in the patient's *initial* plan of care (un-certified) being billed for advance provisional payment; or 50% in the case of a patient being re-certified for a subsequent plan of care. The HHC receives this provisional advance payment from Medicare within a few days after the RAP is dropped by electronic funds or ACH transmission to the HHC. This provisional payment received by the HHC can become an 'obligation' to repay Medicare for purposes of 31 U.S.C. § 3729 (a)(1)(G) to the extent that the final billing for that same patient episode is not in compliance with Medicare's Certification mandates required for final billing. Medicare's provisional advance RAP payment scheme is essentially an honor system payment.

55.   The RAP Medicare billing made by the HHC provisionally is conditioned on the fact that the final billing made for that particular patient is lawful and contains, or will contain, truthful billing certifications, and truthful "on file" certifications, re-certifications, and F2F documentation evidencing medical necessity for home health care provided, prior to the HHC's final billing to

Medicare for a patient's 60 day episode.

56.    A final Medicare billing is then made by the HHC to collect the outstanding 40% of the initial billing, or 50% with respect to patients that were re-certified into subsequent plans of care; as adjusted for additional or less services and/or treatments administered during the 60 day episode that differ from those stated in the RAP previously billed to Medicare at the onset of the episode. Additional services or treatments can be Ordered by an attending physician after the initial RAP is dropped on Medicare, and Medicare will pay additional monies for additional treatments or services Ordered, and adjust the patient's initial plan of care accordingly, increasing the final payment to the HHC, from the remaining balance due just based upon the initial RAP dropped.

57.    When a false HHC certification or re-certification made by a physician is used as the basis for a final HHC billing to Medicare at the conclusion of a patient's 60 day episode: a.) the actual final billing becomes a false or fraudulent claim for payment or approval; b.) the actual false certification or re-certification made (or false F2F made as material part thereof) becomes a false record or statement material to a false or fraudulent claim; and c.) the false certification or re-certifications evidences that the provisional RAP payment should never have been paid to the HHC provisionally, because the HHC was not entitled to that payment. Moreover, the creation of the false record or statement (CMS Form 485) is created in an attempt to improperly avoid or decrease an obligation to pay or transmit money or property to the Government, e.g. the provisional payment received for that same patient episode.

58.    Although failing to repay an 'obligation' to the United States has been a part of the federal false claims act for many years (31 U.S.C. § 3729 (a)(7) "knowingly makes, uses, or causes to be made or used, as false record or statement to conceal, avoid, or decrease an obligation to pay

or transmit money or property to the Government..") in effect prior to May 20, 2009,  Congress

clarified the meaning of 'obligation' for purposes of  § 3729 (a)(1)(G) by specifically defining the

term "overpayment" regarding Medicare payments made, as follows: " The term "overpayment"

means any funds that a person receives or retains under sub-chapter XVIII or XIX to which the

person, after applicable reconciliation, is not entitled under such sub-chapter.." 42 U.S.C. § 1320a-7k

(4)(B)(Effective March 23, 2010).  Moreover, the definition of "overpayments", as defined  in  42

U.S.C. § 1320a-7k (4)(B) was specifically subsumed into the definition of "obligation" as defined

in 31 U.S.C. § 3729 (b)(3) for purposes of false claims act enforcement. Failure to repay a known

obligation to the United States is commonly referred to as a reverse-false claim, because it can

necessitate the return of any funds received from the United States for which the recipient is not

entitled.

59.    As such, one such false certification or re-certification POC or CMS Form 485 in the

health care industry results in a minimum of three (3) separate FCA violations.

## SPECIFIC ALLEGATIONS OF FRAUD AND FCA VIOLATIONS

## VII.    KRISTY MAGEE MD FALSE CERTIFICATIONS MADE FOR MSA BILLING

60.    On or after May 1, 2010, Defendant, MSA, Administrator, Donna Smargon, directly

or indirectly hired  Kristy MaGee, MD to act as a Medical Director of MSA, Winter Park Florida

Office.

61.    Kristy MaGee, MD, an outside physician in practice in the Orlando vicinity, was

compensated by MSA at the rate of $250 per hour for work performed as evidenced in monthly

invoices to MSA beginning in May, 2010 and continuing through at least November, 2011.

62.    Kristy MaGee, MD was compensated by MSA at the rate of $250 per hour for, inter

alia, reviewing MSA -Winter Park Office patient files, signing certifications and re-certifications for MSA patient plans of care billed to Medicare and for signing modification Orders for MSA patient plans of care.

63.    Kristy MaGee, MD was not the primary physician for any of the patients that she signed certifications or re-certifications or modification Orders for, never diagnosed or treated those patients, had no doctor-patient relationship with those patients, and never had any personal encounter with those patients.

64.    Kristy MaGee, MD's primary role for MSA was to sign stacks of paper so that MSA could have certifications and re-certifications [and on information and belief, including, F2F forms for a portion of 2011], merely so that MSA could have some physician's signature "on file" to bill Medicare.

65.    Kristy MaGee, MD signed certifications and re-certifications for MSA authorizing final Medicare billings for the particular 60 day episodes of care prepared by Janet Persaud, MSA Biller/Coder, as specifically referenced in Appendices 1-2 Matrices hereto.

66.    Kristy MaGee signed numerous modification Orders for MSA patients, increasing treatments, increasing skilled visits, increasing therapy visits, and increasing frequency of medication doses administered, and changing patient diagnoses for Medicare billing purposes, that Ms. MaGee had no legal authority to sign, thereby increasing final billing payments due to MSA for those patients being finally billed to Medicare.

## VIII.   MSA WINTER PARK REQUEST FOR ANTICIPATED PAYMENT (RAP) REPORT

67.    Appendixes 1 identifies MSA patients by initials, MSA patient file number and by episode reference numbers 1-110.

68.     Other information contained in Appendix 1 identifies the certification begin date, the certification end date, whether it was an initial certification period, or re-certification period, the patient's HHRG score, the MSA invoice number, the date MSA provisionally billed Medicare for provisional advance payment, the billed initial RAP amount for that patient episode reference, and the page reference number to the Goheen Discharge Summaries, referencing that specific patient.

69.     Relative to Appendix 2 Matrix, Patient AB episode reference 1 for the 60 day certification period 11/5/10-1/3/11, MSA billed Palmetto GBA provisionally via an electronic RAP dropped on 11/29/10 and was paid 60% of $3,348.41, or $2,009.05 within a few days thereafter.

70.     Relative to Appendix 1-Matrix Patient AD episode reference 1 for the 60 day certification period 11/5/10-1/3/11, MSA finally billed Palmetto GPA via an electronic billing via UB 04 CMS Form 1450 on or after 1/3/11, based upon a false or fraudulent "on file" certification signed by Kristy MaGee, MD, and was paid 40% of $3,348.41, or $1,339.36, less the final billing adjustment of <-$173.04>, as noted in Appendix 2, page 9, or $1,166.32 (Appendix 2, episode reference number 1, final collected balance) within a few days thereafter, representing a false or fraudulent claim made for payment or approval within the meaning of 31 U.S.C. § 3729 (A).

71.     Relative to Appendix 1-Matrix Patient AD episode reference 1 for the 60 day certification period 11/5/10-1/3/11, the false or fraudulent claim for payment or approval made by MSA on or after 1/3/11, created an obligation to repay the United States for provisional payments received for patient AB on or after 11/29/10 in the amount of $2,009.05, that MSA was never entitled to receive initially, within the meaning of 31 U.S.C. § 3729 (G), as well as for the finally billed collected amount for Patient AD in episode reference number 1 in the amount of $1,166.32.

**Page 20 of  34**

72.     Relative to Appendices 1-2 Matrices for patient episode reference number 1, Patient AD episode for the 60 day certification period 11/5/10-1/3/11, the related false certification signed by Kristy MaGee, MD, CMS Form 485, represents a false record or statement material to a false or fraudulent claim for payment or approval within the meaning of 31 U.S.C. § 3729 (B).

73.     All other patient episodes specified in Appendices 1-2 Matrices for episode reference numbers 1-110 represent repetitive false claims act violations averments, identical in all material respects, as delineated for patient AB immediately above, to wit: a.) the false or fraudulent claims for payment or approval are delineated in Appendix 2 Matrix as specified in the "on or after final billed date" column and for amounts specified in the "final collected" column, as false or fraudulent claims for payment or approval made by MSA to Palmetto GBA on UB 04, CMS Form 1450s submitted; b.) the false records or statements material to these false or fraudulent claims for payment or approval, represent the false certifications or re-certifications CMS Form 485s signed by Kristy MaGee, MD, as "on file" documentation for specific patient episodes 1-110; and c.) the obligations to repay the United States specified in Appendix 2-Matrix, as specified as the dollar amount specified in the "RAP Collected" column, plus the dollar amounts specified in the "Final Colleted" column, for specific patient episodes 1-110.

## XIX.   SPECIFIC KNOWLEDGE OF MSA BILLING PRACTICES AND PROCEDURES

74.     When Relator became Administrator of MSA Winter Park on August 27, 2012, Janet Persaud MSA Winter Park Coder/Biller was and had been personally preparing all of the coding on MSA Winter Park Patients' plans of care (CMS Form 485s) for years. MSA Winter Park was on a hard paper copy patient file documentation system, that was just being converted to a computerized patient file documentation system at that time, for MSA clinical staff to create computerized patient

file documentation in the field, as opposed to creating hard paper copy documents.

75.     Relator has specific knowledge about the billing practices and procedures employed by MSA Winter Park at the time of Relator's arrival and for all material times hereto, because Janet Persaud was still MSA's Winter Park Biller/Coder when Relator became Administrator, and Relator had daily contact with Janet Persaud. Relator became very familiar with Janet Persaud's activities, including use of the PPS Program scrubber, changing diagnosis codes to increase Medicare billing, and adding skilled nursing visits and/or therapy visits, without doctors' orders or MSA clinician approval. Relator had numerous conversations with Janet Persaud that Ms. Persaud could no longer do these things, as they were unlawful and contrary to federal law and Medicare regulations.

76.     Janet Persaud  MSA  Biller/Coder  had  direct computer connection with Palmetto GBA for purposes of billing initial RAPs dropped, as well as for billing finally for MSA Winter Park HHC Patients on UB 04  CMS 1450 claims for payment or approval,  at all times material to this Amended Complaint.

77.     Janet Persaud MSA Biller/Coder billed Palmetto GBA for all patient episodes specified in Appendices 1-2, both for RAPs dropped and for final billings specified in episode reference numbers 1-110. (Appendix 2).

78.     Relator reviewed patient files related to all patients identified in Appendices 1-2, and specifically examined, all CMS Form 485s contained therein, as prepared by Janet Persaud MSA Biller/Coder for Medicare billing purposes.

79.     Relator specifically discharged all of these patients identified in Appendices 1-2, for reasons specified in the Goheen Discharge Summary, as found on page numbers referenced in Appendix 1 Matrix under the heading "GGD".

80.   Kristy Magee, MD signed false certifications or re-certifications for all of these patients and for patient episodes listed in Appendices 1-2. Janet Persaud MSA Biller/Coder billed Medicare both for initial RAPs dropped and for final claims for payment or approval for these same patient episodes.

81.   The RAPs dropped and the final claims made are all based upon the false certifications and re-certifications for these patients, upon which Medicare billing was made.

82.   Notwithstanding that MSA Winter Park billed Medicare from the Winter Park Office directly, payments received from Palmetto GBA were made to MSA Lexington SC. MSA Lexington SC directly received payments via electronic funds transfer or ACH transfer from Palmetto GBA for all bills and claims submitted by Janet Persaud for all times material to this Amended Complaint.

83.   MSA Lexington SC received all payments identified in Appendix 2 and credited MSA Winter Park on paper as the source of these revenues received for accounting purposes.

84.   Janet Persaud MSA Biller/Coder was inexperienced as a Medicare biller/coder when first employed by MSA Winter Park, and Ms. Persaud was trained by Donna Smargon, MSA Administrator at that time.

85.   Once Relator learned that Janet Persaud was improperly and unlawfully coding and billing Medicare, Relator specifically contacted Christy Jeffcoat, MSA Board Of Directors Member, and Jim Hardin, who told Relator that Janet Persaud 'knew what she was doing' and to allow her to continue because 'that was how they got the high profit margin', or words of similar import. MSA refused to address Janet Persaud's coding and billing improprieties upon Relator's request, would not permit Relator to force Janet Persaud to code correctly, and would not permit Relator to fire Janet Persaud either. At this time Janet Persaud was utilizing MSA's new computer

documentation system for POC preparation, coding and billing. Relator received preliminary orientation in MSA's new computer patient documentation  system on or about September, 2012. On or about December, 2012, or January, 2013, Relator became proficient in MSA's new computer system, and personally audited and corrected  all  MSA  Winter  Park  Patients' plans of care prepared by Janet Persaud, prior to approval by Relator for Medicare billing.

86.    To  the  extent  that  any specific false or fraudulent claims for payment or approval, or  false or  fraudulent  records  or statements related thereto, as specified in Appendices 1-2 Matrices for patient episode reference numbers 1-110, are  deemed  to  be  the  same  transactions (e.g same  patient  episodes) [hereinafter "common transactions"]  which are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party,  as  prohibited  by  31 U.S.C.  §  3730 (e) (3),  then said common transactions,  are  hereby expressly  excluded  from  this Amended Complaint, but  only  to  the  limited  extent  necessary to  exclude  such  preemption.

### COUNTS 1-110, INCLUSIVE
### VIOLATION OF  31  U.S.C.  §  3729 (a)(1)(A)
### FALSE  OR  FRAUDULENT  CLAIM  MADE  TO  THE  UNITED  STATES
### FOR  PAYMENT  OR  APPROVAL
#### (After May 20, 2009)

87.    Relator  adopts   and  realleges  in Counts 1-110 the  allegations contained  in paragraphs 1. through 86. above, including Appendices 1-5, and by this reference incorporates the same as though fully set forth herein.

88.    Beginning  on  or about May 1, 2010, continuing  through  and  including, on or about February 28, 2012, Defendant, MSA,  knowingly  presented, or caused to be presented,  false or fraudulent claims  for  payment  or  approval  to Palmetto GBA, Agent for Medicare home health

care administration for Florida, via electronic submission of UB 04 CMS 1450 forms for MSA patients being finally billed to Medicare, for which CMS 485 certifications or re-certifications were certified by Kristy MaGee, MD, MSA's Medical Director, as opposed to patients' treating physicians, thereby making the 485 certifications or re-certifications false certifications for final Medicare billing UB 04 CMS Form 1450 purposes under federal law and Medicare regulations.

89.    Said false or fraudulent claims for payment or approval that Defendant presented, or caused to be presented to Medicare were made with actual knowledge of the falsity of the information used, were made acting in deliberate ignorance of the truth or falsity of the information used, or were made acting in reckless disregard of the truth or falsity of the information used.

90.    MSA made 110 false or fraudulent claims for payment or approval to Medicare's Agent Palmetto GBA, as delineated in Appendix 2, episode reference numbers 1-110, and contained on pages 1-9 therein, and comprising Counts 1-110, inclusive.

91.    The false or fraudulent claims for payment or approval were made by MSA on UB 04 CMS Forms 1450 on or after the final billed dates specified, for the final payment collected amounts specified, and for approval of the entire patient episode billing amounts specified, in Appendix 2 for episode reference numbers 1-110, inclusive.

92.    MSA is liable is to the United States Government for a civil penalty of not less than $10,781 and not more than $21,563, for each of Counts 1-110, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Counts 1-110.

WHEREFORE, Plaintiff/Relators demands judgment against Defendant, MSA, for civil penalties of not less than $10,781 for each of Counts 1-110, three (3) times the amount of actual

damages that the Government sustained because of Defendant's acts, reasonable expenses incurred, plus reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730 (d)(2), and such other relief as may be deemed equitable and just under the circumstances.

**COUNTS  111-220, INCLUSIVE**
**VIOLATION  OF  31  U.S.C.  §  3729 (a)(1)(B)**
**FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE OR FRAUDULENT**
**CLAIMS  PRESENTED  FOR  PAYMENT  OR  APPROVAL**
**(After May 20, 2009)**

93.   Relator adopts and realleges in Counts 111-220 the allegations contained in paragraphs 1. through 86. above, including Appendices 1-5, and by this reference incorporates the same as though fully set forth herein.

94.   Beginning on or about May 1, 2010, continuing through and including, on or about February 28, 2012, Defendant, MSA, knowingly made, used, or caused to be made or used, false records or false statements  material to  false or fraudulent claims presented, or caused to be presented  for  payment or approval, to Palmetto  GBA, Agent for Medicare home health care administration  for  Florida, that  were  false  final Certifications presented to Medicare  with  UB 04 CMS 1450 final claims for payment or approval made; and 110 separate false "Home Health Certification  And  Plan Of  Care" CMS 485  certifications  or re-certifications, Certified  as true by  Kristy  MaGee, MD, MSA's  Medical  Director,  as opposed to patients' treating physicians, that  are  mandatory "on file" pre-requisites to the aforementioned final billing Certifications, for final  Medicare  billing UB 04 CMS Form 1450 purposes under federal law and Medicare regulations.

95.   Said  false  records  or  false statements material to false or fraudulent claims presented, or caused to be presented for payment or approval, to Palmetto GBA, were made with

**Page 26 of  34**

actual knowledge of the falsity of the information used , were made acting in deliberate ignorance of the truth or falsity of the information used, or were made acting in reckless disregard of the truth or falsity of the information used.

96.   MSA made 110  false  records or false statements material to false or fraudulent claims presented, or caused  to  be presented for payment or approval,  to Palmetto GBA, for patients identified in Appendices 1-2 Matrices, and for episode reference numbers 1-110 specified therein,  and comprising Counts 111-220,  inclusive.

97.   MSA is liable is to the United States Government for a civil penalty of not less than $10,781 and not more than $21,563, for each of Counts 111-220,  as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Counts 111-220.

WHEREFORE,  Plaintiffs'/Relators' demand judgment against Defendant, MSA, for civil penalties of not less than $10,781 for each of  Counts 111-220,  three (3) times the amount of actual damages that the Government sustained because of  Defendant's acts,  reasonable expenses incurred, plus reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730 (d)(2), and such other relief as may be deemed equitable and just under the circumstances.

### COUNTS 221-330,  INCLUSIVE
### VIOLATION OF 31 U.S.C. § 3729 (a)(1)(G)
### CONCEALS OR AVOIDS OBLIGATIONS TO REPAY THE UNITED STATES
#### (After May 20, 2009)

98.   Relator adopts and realleges in Counts 221-330 the allegations contained in paragraphs 1. through 86. above, including Appendices 1-5, and by this reference incorporates the same as though fully set forth herein.

**Page 27 of 34**

99.     Beginning  on  or  about May 1, 2010,  continuing  through  and  including,  on or about  February  28,  2012,  Defendant,  MSA,   knowingly made, used, or caused  to  be made or used, false records or false statements  material to an obligation to pay or transmit money to the Government, or knowingly concealed  or  knowingly  and  improperly  avoided  or decreased  at least 110 separate  obligations to pay or transmit money to the Government.

100.    Requests for anticipated  payments (RAPs) made by MSA for episodes listed in Appendix 2 Matrix, for  episode  reference  numbers 1-110 resulted in 110 separate  provisional advance payments  made  by Palmetto GBA  to MSA Lexington South Carolina for these patient episodes, contingent upon final billing UB04  CMS  Form 1450 Certifications, based upon  truthful CMS  485  certifications or re-certifications being maintained "on file" for these patients finally billed to Medicare's Agent Palmetto GPA.

101.    Said  provisional advance payments received by MSA Lexington, SC are specified in Appendix 2 under the column heading "RAP Collected" for episode reference numbers 1-110 respectively.

102.    The 110  RAP advance payments  received by MSA  Lexingon, South Carolina, became  obligations to repay the United States, within the meaning of 31 U.S.C. § 3729 (a)(1)(G) on the same dates that  these  final patient episodes were billed to Medicare; as truthful CMS Form 485s must  have existed  "on  file", pursuant to federal law and Medicare regulations,  prior to patients' final  home health care billings made to Medicare.

103.    The 110 RAP advance payments received by MSA became obligations to repay the United States, as specified  in Appendix 2,  "on or after final billed date" specified in Appendix 2 for episode reference numbers 1-110.

104.     The 110  final collected payments received by MSA, as specified in Appendix 2 under  the  column  heading "Final Collected" likewise became obligations to repay the United States, on or after the final billed dates specified in Appendix 2 for episode reference numbers 1-110.

105.   MSA's total monetary obligations to repay the United States based upon patient episodes specified in Appendix 2 Matrix is $365,928.32 (Appendix 2, p. 9), and trebled to $1,097,784.96, based upon the entire amounts collected by MSA Lexington SC  for patient episode reference numbers 1-110,  times three. Id.

106.     The false 110  final Certifications presented to Palmetto GBA  with  UB 04 CMS 1450  for  final  episode  billing  submitted  for  Appendix 2,  episode  reference  numbers 1-110, and the underlying false "on  file" CMS Form 485 certifications and re-certifications related thereto, are all false or fraudulent Certification  statements, knowingly made,  material to an obligation to pay or transmit money to the Government, or made to knowingly conceal  or  to  knowingly  and improperly  avoid  or decrease paying back 110  separate  obligations to pay or transmit money to the United States for advanced funds that MSA was not entitled, as well as for a separate 110 final payments collected, for which MSA was not entitled.

107.     Said  false records or false statements  material to obligations  to pay or transmit money to the Government, or to knowingly conceal  or  knowingly and improperly avoid or decrease 110 separate obligations to pay or transmit money to the Government, for the 110 advance RAP payments   received  by MSA, and  the 110 final collected payments received,  as  specified  in Appendix 2, episode  reference  numbers 1-110, were made with actual  knowledge of the falsity of the information  used, or were made acting  in deliberate  ignorance  of  the truth  or  falsity of the information  used, or   were made acting   in reckless disregard of the truth or falsity of the

information  used.

108.     MSA   made  110   false   records  or false  statements  to knowingly  conceal   or knowingly and  improperly avoid or decrease all separate obligations to pay or transmit money to the Government,  as delineated in Appendix 2, episode  reference  numbers  1-110, and  contained on pages 1-9 therein, and comprising Counts 221-330,  inclusive, for all amounts listed under the columns "RAP Collected" totaling $190,678.26,  and "Final Collected" totaling $175,250.06, or combined totaling $365,928.32. (Appendix 2, p. 9)

109.     MSA is liable is to the United States Government for a civil penalty of not less than $10,781 and not more than $21,563, for each of Counts 221-330,  as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Counts 221-320.

WHEREFORE,  Plaintiffs'/Relators'  demand judgment against Defendant, MSA,  for civil  penalties of not less than $10,781 for each of  Counts 221-320,  three  (3)  times  the  amount of actual damages  that  the  Government  sustained  because  of  Defendant's acts,  reasonable expenses incurred,  plus  reasonable  attorney's  fees  and  costs, pursuant to 31 U.S.C. §  3730 (d)(2),  and  such  other  relief  as  may  be  deemed  equitable  and  just  under  the  circumstances.

## COUNT 331
## VIOLATION  OF  31  U.S.C.  §  3730(h)
## RETALIATORY DISCHARGE PROHIBITED BY FCA
### (April 21, 2016)

110.  Relator  adopts  and  realleges  in Count 331  the  allegations contained in  paragraphs 1.  through 86.  above, including  Appendices  1-5,  and  by this reference incorporates the same as though fully set forth herein. Relator also specifically requests that this Court take judicial notice of

the Court's file for purpose of Count 331, including specifically DE 1 and DE 25.

111.   Relator was employed by MSA, Lexington, SC as Administrator for MSA Winter Park Office on or about August 27, 2012, and remained in MSA's employ as Administrator of MSA Winter Park through and including April 21, 2016.

112.   On September 3, 2015, Relator received a performance evaluation as Administrator of MSA Winter Park's Office and received an "exceeds performance" evaluation with the comment "Georgeann is an excellent Administrator". (Appendix 5)

113.   Relator filed the original complaint in this case on March 11, 2014, which remained under Seal until February 2, 2016 at which time Relator's original complaint became publicly visible. [DE 25]

114.   Shortly thereafter MSA became aware that Relator filed the instant case.

115.   On March 8, 2016, MSA placed Relator on a "Employee Formal Counsel Developmental Action Plan" a/k/a "90 Day Action Plan". (Appendix 5)

116.   The 90 day action plan that MSA presented Relator with presented mandates never before presented to Relator that were impossible to achieve within 90 days, while operating within federal laws and Medicare regulations. Relator did not sign this 90 day action plan, notwithstanding that MSA kept pressing Relator to sign that document. (Appendix 5)

117.   On March 22, 2016 MSA was served with the original complaint filed in this case.

118.   On April 4, 2016 a cease and desist demand letter, with attachments including Relator's 90 day action plan, and Relator's September 3, 2015 Performance Evaluation, was furnished to MSA local counsel Richard W. Smith by email and US Mail. (Appendix 5)

119.   MSA was advised that any retaliation by MSA against Relator for filing the above-

styled case would be considered prohibited retaliation pursuant to 31 U.S.C. § 3730 (h), and for which damages to Relator would lie. (Appendix 5)

120.   MSA fired  Relator on  April  21, 2016, in direct retaliation for filing the instant action, and during the pendency of this action,  notwithstanding that MSA may claim other false reasons for firing Relator.

121.   MSA fired Relator because of lawful acts done by the Relator, in furtherance of an action filed under 31 U.S.C. §§ 3729-3733,  to stop 1 or more violations of the false claims act by MSA.

122.   MSA fired Relator intentionally simply to get Relator out of the MSA organization, because Relator filed  the  instant  case, and  had Administrator access to all MSA billing records and patient documentation at MSA Winter Park.

123.   Relator was not paid all monetary amounts due her as of April 21, 2016, on or after April 21, 2016, as MSA withheld payments due to Relator that have not since been paid to Relator.

124.   Relator is entitled to damages in the amount of 2  times the amount of back pay from April 21, 2016  to the date of  judgment in this case, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

125.   Relator was discriminated against in the Orlando area as a result of Relator's termination by MSA after April 21, 2016, and lost job opportunities based upon said unlawful termination by MSA.

126.   MSA is  liable  is  to  Relator  for 2 times the amount of back pay from April 21, 2016, interest thereon, litigation costs, reasonable attorneys fees, and other equitable relief that this

**Page 32 of  34**

Court deems just.

WHEREFORE, Plaintiff/Relator demands judgment against Defendant, MSA, all monetary damages and other equitable relief specified in 31 U.S.C. § 3730 (h)(2), and such other relief as may be deemed equitable and just under the circumstances.

---

## DEMAND FOR JURY TRIAL

Plaintiff/Relator in the above-styled cause demands a trial by jury of all issues triable as a matter of right in Counts 1 through 331.

Respectfully submitted,

**JOSEPH J. PAPPACODA, PA**

*/s/ Joseph J. Pappacoda*

**JOSEPH J. PAPPACODA, ESQUIRE**
**Florida Bar Number: 883018**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via ECF to: Richard W. Smith, Esquire, 390 North Orange Avenue, Suite 2200, Orlando, Florida 32801 (rsmith@fisherlawfirm.com) , David P. Corrigan, Esquire, and Jeremy D. Capps, Esquire, Harman, Claytor, Corrigan & Wellman, P.O. Box 70280, Richmond, Virginia 32355 (dcorrigan@hccw.com  and jcapps@hccw.com), and the United States, to: AUSA Michael D. Granston (michael.granston@usdoj.gov), AUSA Michael Kenneth (michael.kenneth@usdoj.gov), AUSA S. Chartey Quarcoo (stephen.c.quarcoo@usdoj.gov),and AUSA Sara McLean (sara.mclean@usdoj.gov) on this **29th day of March, 2017.**

**Respectfully submitted,**

**_/s/ Joseph J. Pappacoda_**

**Joseph J. Pappacoda, P.A.**
**P.O. Box 551498**
**Fort Lauderdale, Florida 33355**
**954-560-2616**
**Florida Bar Number 883018**
**JoePappacoda@aol.com**